# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

MICHELLE H.,
    Plaintiff,

No. 3:23-cv-1016 (SRU)

v.

MARTIN O'MALLEY, COMMISSIONER
OF SOCIAL SECURITY,
    Defendant.

## ORDER

The plaintiff, Michelle H.[1], commenced this action pursuant to 42 U.S.C. § 405(g)[2] to

reverse the decision of the Commissioner of the Social Security Administration (the

"Commissioner") denying her disability insurance benefits under the Social Security Act

("SSA"). Michelle H. filed a motion for an order reversing the final decision of the

Commissioner. Doc. No. 15. The Commissioner has cross-moved for an order affirming the

decision. Doc. No. 19. For the reasons that follow, I **deny** Michelle H.'s motion to reverse the

decision of the Commissioner, doc. no. 15, and I **grant** the Commissioner's motion to affirm,

doc. no. 19.

## I.      Standard of Review

The SSA follows a five-step process to evaluate disability claims. *See Selian v. Astrue*,

708 F.3d 409, 417 (2d Cir. 2013). First, the Commissioner determines whether the claimant

currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d

Cir. 2015) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not working, the

---

[1] As set forth in the January 8, 2021 Standing Order, the plaintiff is identified by her first name and last initial. *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

[2] In her motion, Michelle H. specifically cited 42 U.S.C. § 405(a), but § 405(g) is the statutory subsection concerning judicial review of a Commissioner's final decision. *See* Doc. No. 15.

Commissioner determines whether the claimant has a "'severe' impairment," *i.e.*, a physical or

mental impairment that limits his or her ability to do work-related activities. *Id.* (citing 20 C.F.R.

§§ 404.1520(c), 404.1521). Third, if the claimant does have a severe impairment, the

Commissioner determines whether the impairment is considered "*per se* disabling" under SSA

regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not

*per se* disabling, then, before proceeding to step four, the Commissioner determines the

claimant's "residual functional capacity" based on "all the relevant medical and other evidence

of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). A claimant's residual

functional capacity ("RFC") is defined as "what the claimant can still do despite the limitations

imposed by his impairment." *Id.* Fourth, the Commissioner decides whether the claimant's RFC

allows him to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f),

404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner

determines, "based on the claimant's [RFC] and vocational factors, whether the claimant can do

other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§

404.1520(g), 404.1560(b)). The process is sequential, meaning that a claimant is disabled only if

he passes all five steps. *See id.*

"The claimant bears the ultimate burden of proving that he was disabled throughout the

period for which benefits are sought," as well as the burden of proof in the first four steps of the

five-step inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the

claimant passes the first four steps, however, there is a "limited burden shift to the Commissioner

at step five." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). At step five, the

Commissioner need show only that "there is work in the national economy that the claimant can

do; he need not provide additional evidence of the claimant's [RFC]." *Id.* (citing 20 C.F.R. § 404.1560(c)(2)).

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374-75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447-48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375 (cleaned up). Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417 (citing *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

## II.    Background

The procedural history and facts set forth in Michelle H.'s motion to reverse are undisputed by the Commissioner. *See* Doc. No. 19-1 at 2; Doc. No. 15-1 at 1-14. I assume the parties' familiarity with the record in this case, and I discuss only the portions relevant to my decision.

Plaintiff Michelle H. was 47 years old on the date last insured. *See* SSA Transcript of Administrative Proceedings, filed on September 21, 2023, Doc. No. 12 (hereinafter "Tr.") at 763. She previously testified that she had not worked since June 2012. Tr. 780-81, 265. Michelle H.

filed an application for Social Security Disability Insurance benefits claiming disability beginning in 2015. Tr. 342, 752, 876.  Her application was denied initially and upon reconsideration. Tr. 153-56, 159-66. At that point, Michelle H. requested a hearing before an administrative law judge ("ALJ"). Tr. 167-71. A hearing before an ALJ was held on August 28, 2018. Tr. 876. On September 28, 2018, the ALJ issued an unfavorable decision, determining that Michelle H. was not disabled under the meaning of the SSA within the timeframe of May 6, 2015 through December 31, 2017. Tr. 12-31.

Michelle H. filed a request for a review of the hearing decision on November 1, 2018, which the Appeals Council denied on August 9, 2019. Tr. 1-6, 228-29. On April 6, 2020, Michelle H. filed suit before this Court on September 6, 2019. *See Michelle H. v. Saul*, Dkt. No. 3:19-cv-01383-SRU, Doc. No. 1. On April 6, 2020, the Commissioner filed a motion for Entry of Judgment pursuant to sentence 4 of the 42 U.S.C. § 405(g) and requested reversal and remand. Tr. at 899-900. On April 16, 2020, the Court granted the Commissioner's motion, reversing the Commissioner's decision and remanding the case. Tr. at 901.

After the case was remanded, a hearing was held before an ALJ on September 9, 2020 and January 20, 2021. Tr. at 914. The ALJ issued an unfavorable decision on March 3, 2021, concluding that Michelle H. did not live with a disability through December 31, 2017. Tr. at 911-926. In March 2021, Michelle H. filed written exceptions to the ALJ's decision. Tr. at 1049-54. On September 28, 2022, the Appeals Council remanded the case to the ALJ for further proceedings due to issues with the audio recording of the hearing. Tr. at 934-37. A third hearing was held on March 22, 2023. Tr. at 774-802. On April 14, 2023, the ALJ issued an unfavorable decision. Tr. at 749-773. On July 28, 2023, Michelle H. filed her complaint in the instant action. Doc. No. 1.

4

A. <u>Medical Evidence</u>

1. *Treatment History*

Michelle H. has a "history of paroxysmal atrial fibrillation." Tr. 528; *see also* Tr. 625. In 2002, Michelle H. experienced a lateral wall myocardial infract during a surgical procedure for mitral valve repair, requiring bypass surgery. *See* Tr. 450, 485, 488, 528. In 2003, she experienced a syncopal event due to ventricular tachycardia. Tr. 528, 1551. "She had a secondary prevention single lead defibrillator implanted and underwent a generator change in 2013." Tr. 528. In the years following the 2002 incident, Michelle H. experienced several occasions of ventricular tachycardia, and in 2012, she ceased her employment. Tr. 265, 493, 496, 528.

On September 19, 2015, Michelle H. experienced an episode of arrhythmia, lasting for 10 seconds. Tr. 628. Michelle. H. subsequently had a medical appointment with Dr. Chakrabarti, her cardiologist, on September 21, 2015. Tr. 630. She reported experiencing "exertional dyspnea with 2 pillow orthopnea." *Id*. She also reported experiencing "rapid heart action" and "major palpitations." *Id*. She had a follow-up medical appointment with Dr. Chakrabarti on October 13, 2015, during which Dr. Chakrabarti performed an interrogation of her defibrillator, which showed normal function. Tr. 628, 758. During another appointment with Dr. Chakrabarti on October 27, 2015, Michelle H. reported symptoms of "exertional shortness of breath, 2 pillow orthopnea, [and] rapid heart action with palpitations and fatigue," but "[n]o chest pains" or "chest discomforts." Tr. 625. Dr. Chakrabarti increased her beta blocker dosage. Tr. 626.

On February 19, 2016, Michelle H. was seen by Dr. Zafar, her primary care physician, for an annual physical. Tr. 361, 758. She denied, *inter alia*, fatigue, chest pain, and shortness of breath, and she reported "feeling fine." Tr. 361-62.

Michelle H. had another appointment with Dr. Chakrabarti on March 3, 2016. Tr. 366. She reported symptoms of "external dyspnea, two-pillow orthopnea, and chest pressure." *Id*.

Echocardiogram results showed "[s]ignificant abnormalities" and suggested ischemia. Tr. 366-67. Dr. Chakrabarti's notes state that a pharmacologic nuclear stress test would be conducted to determine whether there is ischemia. Tr. 366. In addition, blood work showed that her brain natriuretic peptide levels were elevated, "suggest[ing]" congestive heart failure. *Id*. Dr. Chakrabarti increased Michelle H.'s beta blocker dosage in response to "recent evidence of increased ectopy." *Id.*

On April 12, 2016, Michelle H. was seen by Dr. Chakrabarti for a follow-up appointment. Tr. 369. Appointment notes state that a February 3, 2016 echocardiogram showed a low left ventricular ejection fraction of 45%. Tr. 369, 758. A pharmacologic nuclear stress test was conducted in March 2016. Tr. 369, 410. The test showed "a large fixed inferolateral and anterolateral defect." Tr. 369, *see also* Tr. 411. Results from a SPECT test showed "severely reduced global [left ventricular ejection fraction] of 17%." Tr. 411, 758. Additionally, diastolic and systolic volumes "suggest[ed] . . . a dilated cardiomyopathy." Tr. 411. The appointment notes from Michelle H.'s April 12 visit also state that Michelle H. was "doing well," and that "[s]he denie[d] any chest pain or chest discomfort." Tr. 369. Further, "[s]he [wa]s able to walk on flat ground for 10 min. without limitations" and "able to climb 2 flights of steps." *Id*.

Michelle H. had a follow-up appointment with Dr. Chakrabarti on October 18, 2016. Tr. 383. She reported experiencing "mild to moderate fatigue on exertion" and "[r]are episodes of palpitation." *Id.* She did not report chest pain. *Id*. Dr. Chakrabarti assessed her with NYHA Class II heart failure.[3] Tr. 384.

---

[3] According to the American Heart Association, NYHA (New York Heart Association) Class II heart failure corresponds with the following symptoms: "Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, shortness of breath, or chest pain." *Classes and Stages of Heart Failure*, Am. Heart Ass'n, *available at* https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure (last accessed Sept. 26, 2024).

Michelle H. saw her primary care provider, Dr. Zafar, on March 2, 2017 for a follow up appointment, regarding, among other conditions, her ischemic cardiomyopathy. Tr. 533. She denied, *inter alia*, fatigue, chest pain, and shortness of breath, and she reported "feeling fine." Tr. 533-34.

An echocardiogram was performed on April 3, 2017, showing that Michelle H. had an improved left ventricular ejection fraction of 55%. Tr. 429, 759. During an April 25, 2017 appointment with Dr. Chakrabarti, Michelle H. reported "mild to moderate fatigue but no chest pain or chest discomfort." *Id.*

On August 10, 2017, Michelle H. was seen by Dr. Decena, a cardiologist. Tr. 426. Treatment notes from that visit state that she complained of "mild to moderate fatigue but no chest pain or chest discomfort," and her monitor showed "frequent" premature ventricular contractions "but no atrial fibrillation." Tr. 426, 758-59. The notes further state that Michelle H. complained of "heavier bleeding during her menses." Tr. 426.

Michelle H. experienced acute sustained ventricular tachycardia lasting for over an hour and a half on August 24, 2017. Tr. 434, 447-48, 450. She arrived at the emergency room in "[c]ritical" condition, reporting symptoms of "[a] fast heart rate," gastrointestinal symptoms including vomiting and nausea, and "marked fatigue" and "dizziness." Tr. 434, 440, 587. She underwent emergency defibrillation. Tr. 450, 587. She was subsequently transferred to Hartford Hospital, where she underwent a diagnostic coronary angiogram and cardiac electrophysiology evaluation. Tr. 587-89. She stayed at Hartford Hospital from August 24 through August 27, 2017. Tr. 446-47. She was diagnosed with "[c]hronic systolic heart failure presumed ischemic in nature," with an ejection fraction of 30%. Tr. 448. Cardiac cathertization showed "occlusion of

the proximal" left circumflex "with a widely patent vein graft to [the] vessel" and "[a] moderate-sized obtuse marginal" occlusion that "was not bypassed." Tr. 1403, 1489.

Michelle H. saw Dr. Chakrabarti again on August 29, 2017. Tr. 587. Dr. Chakrabarti reviewed her echocardiogram and concluded that "she may . . . have a focal area in the [left ventricular] wall that may be amenable to ablation therapy." Tr. 587. At the appointment, Michelle H. reported symptoms of "marked weakness and shortness of breath." *Id*. Appointment notes state that she was still in NYHA Class II heart failure. *Id*. Dr. Chakrabarti referred Michelle H. to Dr. Blitzer for a cardiac electrophysiology consultation. Tr. 587, 589.

On September 1, 2017, Michelle H. saw Dr. Blitzer. Tr. 528-29. Michelle H. had experienced three episodes of sustained ventricular tachycardia in eight days preceding the appointment, one of which included the episode that led to her hospitalization. Tr. 529. Dr. Blitzer recommended she undergo an ablation procedure, which Michelle H. then underwent on November 9, 2017. Tr. 528-30, 548-49, 759. When she was discharged on November 10, 2017, Michelle H. reported no chest pain, shortness of breath, "palpitation, nausea, fever, chills, headache, or dizziness." Tr. 551, 759. She stated that she was "fine." *Id.*

Michelle H. also saw her primary care physician on September 7, 2017. Tr. 541. Treatment notes from that appointment state that she is "feeling fine" and that she denies, *inter alia*, fatigue, chest pain, and shortness of breath. Tr. 541-42.

Michelle H. saw Dr. Chakrabarti for a follow-up appointment on December 19, 2017. Tr. 596. She reported "daytime sleepiness and fatigue." *Id.* A "[h]ome sleep study" was prescribed. Tr. 597. In addition, appointment notes state that "[f]rom a cardiovascular standpoint, she is doing well overall." Tr. 596.

On January 9, 2018, Michelle H. saw her primary care physician, Dr. Zafar, for a follow up visit. Tr. 678. Treatment notes from that appointment state that she is "feeling fine" and that she denies, *inter alia*, fatigue, chest pain, and shortness of breath. Tr. 678-79.

Appointment notes from an April 10, 2018 medical visit with Dr. Chakrabarti state that Michelle H. was diagnosed with sleep apnea after the performance of a home sleep study. Tr. 663. She began using a CPAP machine. *Id*. The notes further state that a "[r]ecent [defibrillator] interrogation show[ed]" a brief monomorphic ventricular tachycardia episode, which was "accompanied by palpitations." Tr. 663, 760.

Michelle H. returned to visit Dr. Blitzer on June 4, 2018. Tr. 648. Michelle H. reported that, the previous month "while at a stop light, she felt 'weird,'" which may have been due to "some skipped heartbeats." Tr. 648. Dr. Blitzer checked her defibrillator, which showed "weekly bursts of unsustained" ventricular tachycardia, one episode of which may have occurred during the incident at the stop light. Tr. 649, 760. In a letter to her cardiologist, Dr. Blitzer wrote that Michelle H. "does not do any formalized exercise, but gets out to 'big box stores' to walk around." Tr. 648. Later in his letter, he wrote that Michelle H. could "do more in terms of reconditioning with a more formalized exercise plan." Tr. 649. Michelle H. then saw Dr. Chakrabarti on July 10, 2018. Tr. 695. She reported "daytime sleepiness and fatigue." Tr. 695.

Michelle H. began seeing Dr. Sablani, a cardiologist, following the passing of her previous cardiologist. *See* Tr. 1293; *see also* Doc. No. 15-1 at 6. She saw Dr. Sablani on October 23, 2019. Tr. 1293. She "report[ed] that she feels well from a cardiovascular perspective." *Id*. However, she also reported "feeling fatigued for the last several months." *Id*. She stated that she was able to go to the grocery store, but "sometimes needs to hold onto the cart or take a break because of fatigue." *Id*. She reported being "minimally active," and that "usually if she has to

unpack groceries, she would [unpack] perishables first, take a break and then resume" due to her fatigue. *Id*.

    2.  *Medical Opinions*

    In 2013, Dr. Chakrabarti completed a medical source statement for Michelle H. in connection with an earlier application for SSA disability benefits. *See* Doc. No. 15-1 at 7; Tr. at 83. Dr. Chakrabarti stated that Michelle H. complains of "chest pain, syncope and fatigue." Tr. 83. Further, in his opinion, she "is unable to sit or stand for more than 2 hours in an 8-hour workday," she would "need to alternate between sitting and standing," and cannot carry more than 10 pounds. Tr. 83.

    A medical source statement completed by Dr. Sablani on July 22, 2020 identified Michelle H.'s symptoms as syncope, palpitations, chronic fatigue, and dizziness. Tr. 1398-1401. In terms of frequency, Dr. Sablani stated that Michelle H. would experience fatigue daily and lightheadedness frequently. Tr. 1398. Dr. Sablani wrote that Michelle H.'s symptoms were "mostly due" to "chronic illness," as opposed to "stress." Tr. 1399. She therefore concluded that Michelle H. was "[c]apable of low stress work" and "could do [a] desk job with low stress." *Id*. She found Michelle H. able to walk three blocks without stopping, sit for more than two hours at one time, and stand for no more than 20 minutes at one time. *Id.* She wrote "unknown" when asked how long Michelle H. could sit and stand/walk in an eight-hour working day. *Id*. She further submitted that Michelle H. would need to "take unscheduled breaks during the workday . . . once or twice to rest." *Id*. She identified that her "impairments" were "likely to produce 'good days' and 'bad days.'" Tr. 1400. She estimated that she would need to take about three absences per month if working full time. *Id.*  Dr. Sablani further wrote that Michelle H. could occasionally lift and carry 10 pounds and frequently lift and carry less than 10 pounds. *Id*.

Dr. Bridgers, a non-examining state agency medical consultant, prepared an RFC assessment on November 29, 2016. Tr. 85-89. He concluded that Michelle. H. has "[e]xertional limitations . . . due to [congestive heart failure] causing fatigue and dyspnea." Tr. 86. He opined that she could occasionally lift or carry 10 pounds, frequently lift or carry less than 10 pounds, stand or walk for 4 hours, and sit for 6 hours in an 8-hour workday. Tr. 85-86. He further concluded that Michelle H. has some "postural limitations" also due to her condition. Tr. 86. He concluded that she could conduct sedentary work. Tr. 88.

On May 18, 2017, Dr. Lee, another non-examining medical consultant, completed an RFC assessment for Michelle H. Tr. 99-101. He opined that Michelle H. has exertional limitations and postural limitations due to her congestive heart failure "causing fatigue and dyspnea." Tr. 99-100. He determined she could occasionally lift or carry 10 pounds, frequently lift or carry less than 10 pounds, stand or walk for 4 hours, and sit for 6 hours in an 8-hour workday. Tr. 99.

Dr. Caudill completed a medical consultant's review of Michelle's physical RFC assessment on July 10, 2017, in response to an internal disagreement regarding whether Michelle H. had sedentary residual functional work capacity. Tr. 419-20; *see also* Tr. 301-08.  He checked boxes to show that he agreed with the Disability Determination Services' (DDS's) conclusions regarding Michelle H.'s limitations, symptoms, and her treating or examining source statements. Tr. 419. He also wrote that "[t]he RFC as prepared by the DDS is well supported for ischemic cardiomyopathy with very dilated LV, large posterior lateral scar and cardiac arrhythmias." *Id*.

On June 30, 2017, Dr. Warren, a non-examining consultant, concluded that Michelle H. exhibits "mild anxiety symptoms" and "retains the capacity to perform basic tasks and relate with others well enough for routine workplace purposes." Tr. 97. He further determined that she

has understanding and memory limitations, specifically with respect to the ability to understand and remember detailed instructions. Tr. 101-02.

Dr. Murphy conducted a psychological evaluation on February 15, 2013. Tr. 700. She concluded that Michelle H. had "scored in the borderline range of intelligence . . . with high school grade level spelling and reading skills, and below average math skills." Tr. 703. She further stated that "[h]er academic and vocational history suggests a long history of subaverage cognitive functioning." Tr. 703-04.

Dr. Cosentino performed a mental status examination for Michelle H. on June 23, 2017. Tr. 705. She concluded that Michelle H.'s "[a]ttention and concentration likely fall in the borderline to low average range," her "[w]orking memory likely falls in the borderline range," her "[a]bstract reasoning and conceptualization likely falls in the low average range," and her "[j]udgment likely falls somewhat below average." Tr. 706. She diagnosed her with an "[u]nspecified [a]nxiety disorder." Tr. 707.

B. <u>The ALJ Hearing and Decision</u>

1. *Hearing Testimony*

Michelle H. testified about her symptoms at the hearing on March 22, 2023. Tr. 776-801. She testified that her "tiredness" prevents her from working. She explained, "I basically wake up during the morning, and I'm not sure if I am awake enough, or . . have enough energy to do any kind of task. There [are] days that I wake up, and . . . [I] thought I got a good night's sleep, and I'm just tired . . . I just randomly fall asleep." Tr. 782. She further testified that she forgets things, using an example of her husband asking her to do certain things in the morning and her forgetting later in the day. Tr. 782-83. She testified that she occasionally experiences a rapid heartrate, which "freaks [her] out," and she has to "sit down" and "put [her] feet up more." Tr.

783. She also has to "take a bunch of deep breaths" and "drink some water" to reduce her heart rate. *Id.* She further testified that, before her ablation procedure in 2017, she would experience rapid heartbeats "[a]t least once a day" or "every other day," and although they would last "[a]nywhere from a minute to a few minutes," they "feel[] like forever." Tr. 789, 791. Michelle H. also explained that her symptoms worsen in the heat and during the summer. Tr. 783-84. Additionally, the heart medications she would take during that time period would lead to "extremely heavy" and longer periods of menstruation. Tr. 785-86. She testified that her symptoms have been ongoing since at least 2015. Tr. 783.

In terms of her activity levels during that time period, she testified that she would base her activities on "what [she] could do that day," and was unable to plan her tasks in advance. Tr. 786. She could do certain home tasks like cleaning, but she would have to take breaks at least every 10 or 15 minutes. Tr. 786, 793. Those breaks would be for about 20 minutes. Tr. 793. She testified that she was unable to "spend . . . the whole weekend . . . doing . . . all the laundry, going grocery shopping, [and] putting everything away." Tr. 786. In her testimony, she alluded to instructions from her doctor to exercise. Tr. 787. She testified that she struggled, even on a cool day, to "walk around [her] block without taking frequent breaks" and drinking water. *Id.* On her average day, she testified that she could walk "halfway around the block, or a quarter to half," but "it all depends." *Id.* On a "good day," walking half a block would take her 15 minutes. Tr. 787-88.

She testified that she would experience shortness of breath when moving around her home as well. Tr. 788. She testified that she would experience those bouts of shortness of breath suddenly while "walking from one room to another," or when trying to do household chores. Tr. 788.

13

Additionally, Michelle H. testified that between 2015 and 2017, she would care for her daughter. Tr. 794. She would help her "get[] in and out of the shower," make sure she took her medication, sometimes help her with preparing breakfast or a snack, and help her get dressed. Tr. 794-95.

After Michelle H. testified, the ALJ heard from a vocational expert. Tr. 796. The ALJ asked the vocational expert several hypothetical questions. Tr. 798. First, the ALJ posed the following hypothetical:

> Please assume that this hypothetical individual is restricted to no more than a range of work defined as sedentary. No climbing of ladders, ropes, or scaffolds. No exposure to unprotected hazards, such as machinery and heights. Occasional climbing of ramps and stairs, occasional stooping, kneeling, crouching, and crawling. Frequent balancing. Limited to no more than occasional exposure to extremes of temperature, humidity, and should avoid concentrated exposure to environmental irritants, such as dust, fumes, odors, and gasses. This hypothetical individual is able to understand, remember, and carry out simple instructions.

Tr. 798. In response to that hypothetical, the vocational expert concluded that that individual would be able to perform "[s]edentary and unskilled" work, including working at a ticket counter, as a document preparer, or a sorter. Tr. 798. The vocational expert further testified that the same employment would be available for the above hypothetical individual if that individual also "would be restricted to lifting no more than ten pounds occasionally, and five pounds frequently, for lifting and carrying." Tr. 799. The ALJ then posed a third hypothetical:

> [A]ssume that even if this hypothetical individual had the capacity to perform tasks within the parameters of each of those hypotheticals, but . . . assume that during the course of a typical workday or workweek, this individual would require periods of rest or absence that would occur unpredictably, and that it occurred approximately 15% of a typical workday or workweek, outside of customary lunch and other breaks.

Tr. 799-800. In response to that hypothetical, the vocational expert concluded that "[n]o full-time, competitive, unskilled employment" would be available to an individual with those

14

limitations. Tr. 800. The ALJ subsequently asked, as a follow up, what jobs would be available to the person if they were to "average[] one to two days a month of complete absence," with absences more frequently some months and less frequently others. Tr. 800. The vocational expert responded that "[n]o full time, competitive, unskilled employment" would be available. *Id.*

In response to additional questions from the attorney, the vocational expert further testified that employers tolerate "[u]p to 15%" of "off task behavior," and more than that would "eliminate competitive employment." Tr. 800. Regarding absences, the vocational expert testified that "[o]ne absence a month may be tolerated." *Id*. Additionally, if the employee needs to have their legs elevated "[w]aist high" for "at least 30% of the workday, during the working hours," then no employment would be available. Tr. 800-01.

2.  *The ALJ's Decision*

Following the hearing, the ALJ issued an unfavorable decision on April 14, 2023. Tr. 749. The ALJ followed the five-step sequential evaluation process. Tr. 753-54. *See* 20 C.F.R. § 404.1520. At step one, the ALJ found that Michelle H. had "not engage[d] in substantial gainful activity" for the period from May 6, 2015 through December 31, 2017. Tr. 754. At step two, the ALJ found that Michelle H. had the following severe impairments: "congestive heart failure/cardiomyopathy status post implantable cardioverter defibrillator ('ICD') implant, arrhythmia . . . [and] borderline intellectual functioning." Tr. 754 (cleaned up). At step three, the ALJ concluded that Michelle H. "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Tr. 755.

Before proceeding to step four, the ALJ determined that Michelle H. retained the RFC to "perform sedentary work" as defined by C.F.R. 404.1567(a), except with the following limitations:

> [S]he can lift/carry 10 pounds occasionally and 5 pounds frequently; never climb ladders/ropes/scaffolds; have no exposure to unprotected hazards such as machinery and heights; occasionally climb ramps/stairs, stoop, kneel, crouch, crawl; frequently balance. She can have no more than occasional exposure to extremes of temperature and humidity; should avoid concentrated exposure to environmental irritants such as dust, fumes, odors and gases. She is able to understand, remember and carry out simple instructions.

Tr. 756-57. As part of the ALJ's RFC determination, the ALJ noted that although Michelle H.'s "medically determinable impairments could reasonably be expected to cause" the symptoms to which Michelle H. testified, Michelle H.'s "statements concerning the intensity, persistence and limiting effects of [those] symptoms are not entirely consistent with the medical evidence and other evidence in the record." Tr. 758. In drawing that conclusion, the ALJ considered and cited various medical record and opinion evidence. *See* Tr. 758-62.

At step four, the ALJ found that Michelle H. was unable to perform her past relevant work. Tr. 762. Finally, at step five, the ALJ concluded that "there were jobs that existed in significant numbers in the national economy that [she] could have performed." Tr. 763. Those jobs included, for example, ticket counter, document preparer, and sorter work. Tr. 763. The ALJ thus determined that Michelle H. was not under a disability, as defined in the SSA, from May 6, 2015 through December 31, 2017. Tr. 764.

## III.   Discussion

On appeal, Michelle H. argues that (1) the ALJ erred in his RFC assessment by not considering all of her restrictions; and (2) the ALJ's conclusions at step five were not supported by substantial evidence. *See generally* Doc. No. 15-1. The Commissioner counters by arguing

16

that the Commissioner's findings are supported by substantial evidence and that Michelle H. failed to meet her burden on appeal. *See generally* Doc. No. 19-1. As I articulate in greater detail below, I find no legal error in the ALJ's assessment and conclude that the ALJ's determination was supported by substantial evidence.

A. The ALJ's RFC Assessment

Michelle H. contends that the ALJ erred in determining her RFC. The Commissioner argues that Michelle H.'s challenges to the ALJ's findings are unsupported. Doc. No. 19-1 at 5.

An individual's RFC is their "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). The ALJ is responsible for "assess[ing]" a claimant's RFC "based on all the relevant evidence in [their] case record." 20 C.F.R. § 404.1545(a)(1). Additionally, the ALJ is required to "consider all" of a claimant's "symptoms, including pain, and the extent to which [their] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). Subjective statements about "pain or other symptoms will not alone establish" that a claimant is "disabled," however. *Id*. Thus, although "the ALJ is required" to take the claimant's subjective reports of their symptoms "into account," the ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

As previously mentioned, the standard of review when evaluating an ALJ's factual findings is "very deferential." *Brault*, 683 F.3d at 447-48. I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374-75. Substantial evidence

means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 375 (cleaned up). Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417. Further, to the extent that evidence in the record conflicts, it is within the ALJ's discretion to resolve those conflicts. *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998). "The substantial evidence standard means once an ALJ finds facts, [a district court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (emphasis removed and quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

1. *The ALJ's Failure to Include Off Task Limitations*

Michelle H. contends that the ALJ erred in not incorporating off task limitations when formulating Michelle H.'s RFC. Doc. No. 15-1 at 14. Specifically, Michelle H. argues that the ALJ erred by not "tak[ing] into consideration the plaintiff's chronic and severe fatigue associated with her very significant cardiac condition, which causes her to fall asleep unexpectedly and requires her to rest on a frequent basis during the day; failed to consider her daily episodes of rapid heartbeat and need to stop activity when they occur; failed to consider the plaintiff's shortness of breath with exertion; and failed to consider the plaintiff's memory and cognitive impairments associated with her cardiac condition." Doc. No. 15-1 at 15-16.

Michelle H.'s contention that the ALJ failed to consider those factors is unsupported. On the contrary, the ALJ expressly considered Michelle H.'s testimony regarding her fatigue, shortness of breath, and rapid heartbeat episodes, Tr. 757-58; considered her medical treatment notes, which confirmed that Michelle H. had experienced those symptoms, Tr. 758-60; and

considered the psychological opinions of medical professionals, which provided that Michelle H. had moderate concentration and memory limitations, Tr. 755-56.

In considering that evidence, the ALJ arrived at the factual finding that Michelle H.'s "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Tr. 758. In other words, the ALJ considered and acknowledged the symptoms of Michelle H.'s that were supported by the medical evidence. Where the ALJ and Michelle H. diverge, however, is in the ALJ's factual determination regarding the frequency, severity, and disabling effects of those symptoms.

Michelle H. testified at the hearing that she would experience rapid heartbeat episodes "[a]t least once a day" or "every other day," which required her to rest. Tr. 783, 789, 791. Although Michelle H. provided estimates during her testimony regarding the frequency of her symptoms, she also often qualified her testimony by stating that her symptoms were inconsistent. *See, e.g.*, Tr. 783-84 (testifying that back when she was working, she would experience the rapid heartbeat and fatigue episodes more frequently in the summer); Tr. 786 (testifying that her activity levels depended on the day, that she "couldn't plan out" doing certain tasks "on a specific day"—it "has to be based on how [she] wake[s] up" and feels that day); Tr. 787-88 (testifying that how far she could walk "depends," as does her pace, and that the heat was an additional factor that affected her ability).

Treatment notes in the record, which the ALJ considered, Tr. 758-60, and which are summarized in a non-exhaustive list below, show that Michelle H. did report those symptoms to her treating physicians on a fairly consistent basis:

19

- September 21, 2015: shortness of breath[4], rapid heartbeats (Tr. 630)

- October 27, 2015: shortness of breath, rapid heartbeats, fatigue (Tr. 625-26)

- February 19, 2016: "feeling fine," denied fatigue, shortness of breath, and chest pain (Tr. 361-62)

- March 3, 2016: shortness of breath, chest pressure (Tr. 366)

- April 12, 2016: Michelle H. reported "doing well," was "able to walk on flat ground for 10 [minutes] without limitations," and "able to climb 2 flights of steps" (Tr. 369)

- October 18, 2016: mild to moderate fatigue on exertion, rare episodes of heart palpitations (Tr. 383)

- March 2, 2017: "feeling fine," denied fatigue, shortness of breath, and chest pain (Tr. 533-35)

- April 25, 2017: "mild to moderate fatigue" (Tr. 429)

- August 24, 2017: marked fatigue, dizziness, and a fast heart rate (Tr. 434, 440, 587)

- August 29, 2017: marked weakness and shortness of breath (Tr. 587)

- September 7, 2017: "feeling fine," denied fatigue, shortness of breath, and chest pain (Tr. 541-42)

- November 9, 2017: reported no shortness of breath or palpitations and felt "fine" (Tr. 551)

---

[4] "The medical term for shortness of breath is dyspnea." *Shortness of Breath*, Am. Lung Ass'n, *available at* https://www.lung.org/lung-health-diseases/warning-signs-of-lung-disease/shortness-of-breath (last accessed June 25, 2024).

- December 19, 2017: daytime sleepiness and fatigue. Her treating physician wrote that "[f]rom a cardiovascular standpoint, she is doing well overall." (Tr. 596)

- January 9, 2018: "feeling fine," denied fatigue, shortness of breath, and chest pain (Tr. 678-79)

- June 4, 2018: reported an incident of skipped heartbeats, and her defibrillator showed "weekly bursts of unsustained" ventricular tachycardia. (Tr. 648, 760; Doc. No. 19-1 at 11) Her physician wrote that she "does not do any formalized exercise, but gets out to 'big box stores' to walk around." (Tr. 648)

- July 10, 2018: daytime sleepiness and fatigue (Tr. 695).[5]

Although Michelle H. avers that her rapid heartbeat episodes occurred "daily" and that she needed to "rest on a frequent basis during the day," the record evidence in totality does not necessarily support that claim. Doc. No. 15-1 at 15. "[G]enuine conflicts in the medical evidence are for the Secretary to resolve." *Aponte v. Sec'y, Dep't of Health & Hum. Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). "Under the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence . . . ." *Lillis v. Colvin*, 2017 WL 784949, at *4 (D. Conn. Mar. 1, 2017) (cleaned up). Here, there was conflicting evidence in the record regarding how often Michelle H. would experience rapid heartbeats, how often she would experience fatigue and shortness of breath, and how often she would experience severe episodes of those symptoms. There was substantial evidence to support the ALJ's resolution of that issue, that is, that Michelle

---

[5] Although Michelle H.'s treatment notes from 2018 are from after the date last insured, those notes might be relevant to the extent that they could reflect Michelle H.'s accounting of her symptoms for the previous several months.

H.'s symptoms were not so frequently severe to prevent her from engaging in sedentary work. Tr. 756-57. The ALJ's finding therefore "must be upheld." *Selian*, 708 F.3d at 417.

2. *The Consistency of the Plaintiff's Testimony Over the Years*

Michelle H. further argues that the ALJ erred in finding her testimony "not entirely consistent" with the record evidence because "[t]he plaintiff's testimony and her statements about the intensity, persistence, and limiting effects of her symptoms at the hearing on March 22, 2023 were consistent with her previous testimony contained in the record." Doc. No. 15-1 at 16.

It is within the "discretion" of the ALJ, however, "to weigh[] the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)); *see also Carroll v. Sec'y of Health & Hum. Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) ("It is the function of the Secretary, not ourselves, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."). Thus, so long as his factual findings were supported by substantial evidence, it is not error for the ALJ to determine that Michelle H.'s testimony was not entirely consistent *with the medical record*, even if Michelle H. herself testified consistently on more than one occasion. It is also perfectly appropriate for the ALJ to consider Michelle H.'s treatment notes when evaluating the credibility of her testimony. *See Corbiere v. Berryhill*, 760 F. App'x 54, 57 (2d Cir. 2019) (It is appropriate for the ALJ to "consider[] all the medical evidence and evaluations presented to him, including from providers to whom [the claimant] self-reported symptoms."). Michelle H.'s argument that the ALJ erred because of the consistency of Michelle H.'s testimony is therefore unavailing.

3.  *Consistency of the Plaintiff's Testimony with the Medical Opinions*

In addition, Michelle H. also argues that her testimony was "consistent with the finding of the Social Security Administration physicians who have reviewed her case" and "consistent with the objective cardiac findings documented by her treating physicians" Doc. No. 15-1 at 20.

The ALJ expressly considered the opinions of the Social Security Administration physicians who reviewed Michelle H.'s case. *See* Tr. 761-62 (weighing the opinions of Dr. Bridgers, Dr. Lee, and Dr. Caudill). To the extent that the ALJ determined that Michelle H.'s testimony was not entirely consistent with the opinions of those physicians, that finding was supported by substantial evidence. Specifically, Michelle H.'s position is that, based on the "intensity of her symptoms," the ALJ should have incorporated an off task limitation into Michelle H.'s RFC. Doc. No. 15-1 at 20-21.

The Social Security Administration physicians, however, did not discuss the need for an off task limitation. Even though he noted that she had [e]xertional limitations . . . due to [congestive heart failure] causing fatigue and dyspnea," Dr. Bridgers concluded that Michelle H. could undertake sedentary work and opined that she can sit stand or walk for 4 hours and sit for 6 hours in an 8-hour workday. Tr. 84-88. Similarly, Dr. Lee determined that Michelle H. had exertional and postural limitations due her congestive heart failure "causing fatigue and dyspnea," but opined that she can stand or walk for 4 hours and sit for 6 hours in an 8-hour workday." Tr. 99-100. Dr. Caudill reviewed the record evidence and Dr. Bridgers' and Dr. Lee's opinions and concurred with their conclusions. Tr. 419-20.

Accordingly, none of the three physicians discussed an off task limitation. The ALJ is permitted to infer that Michelle H. did not need an off task limitation based on the omission of that limitation from the physicians' reports. *See Parker v. Berryhill*, 2018 WL 4111191, at *4 (W.D.N.Y. Aug. 29, 2018) (citing *Diaz v. Shalala*, 59. F.3d 307, 315 (2d Cir. 1995); *Samuel v.*

*Comm'r of Soc. Sec.*, 2014 U.S. Dist. LEXIS 163220, at *4, 2014 WL 11342730 (E.D.N.Y. June 3, 2014)). The ALJ therefore did not err in finding that Michelle H.'s testimony was not entirely consistent with the Social Security Administration physicians' opinions, particularly with regard to the inclusion of an off task limitation.

Nor did the ALJ err in his consideration of the treating physicians' opinions. The ALJ gave limited weight to the opinion of Dr. Sablani because she began treating Michelle H. in October 2019, after the relevant timeframe. Tr. 762. The ALJ did not err in doing so. As an initial matter, Dr. Sablani's opinion did not expressly state that Michelle H. would need off task time—it only stated that she would need to miss three workdays per month. Tr. 1399-1400. Furthermore, it is not an error for an ALJ to give limited weight to the opinion of a treating physician outside of the relevant time period. *See Flanigan v. Colvin*, 21 F. Supp. 3d 285, 303 (S.D.N.Y. 2014) (collecting cases).

Similarly, Michelle H.'s prior treating physician, Dr. Chakrabarti, only opined on Michelle H.'s limitations prior to the relevant timeframe. Tr. 132; Tr. 40. Although this Court is sympathetic to the fact that Michelle H.'s treating physician passed away and therefore could not opine on Michelle H.'s limitations during the relevant time period, the burden nevertheless lies with Michelle H. to prove her disability. *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (noting claimant's burden to prove disability within the meaning of the SSA). The ALJ thus did not err in his weighing of the treating physicians' opinions.

### 4.  *ALJ's Inferences Based on Michelle H.'s Ability to Walk at "Big-Box Stores"*

Michelle H. also argues that the ALJ erred by drawing a negative inference against her based on her "ability to perform daily tasks." Doc. No. 15-1 at 19. She challenges the ALJ's reliance on a statement from a letter by Dr. Blitzer, in which the doctor stated that Michelle H.

"does not do any formalized exercise, but gets out to 'big-box stores' to walk around." Doc. No. 15-1 at 19; Tr. 648.

Courts have recognized, for example, that "relying on attendance at medical appointments is unhelpful in determining whether an individual [with a psychiatric condition] can consistently show up and successfully function in a work environment." *Rucker v. Kijakazi*, 48 F.4th 86, 93 (2d Cir. 2022) (collecting cases). But an ALJ does not necessarily err by considering a claimant's ability to perform daily activities, even if evidence regarding that ability conflicts with other record medical evidence. *See Medina v. Comm'r of Soc. Sec.*, 831 F. App'x 35, 36 (2d Cir. 2020) (citing *Rivera v. Harris*, 623 F.2d 212, 216 (2d Cir. 1980)).

Regarding the ALJ's reliance on the reference to Michelle H. walking in "big-box stores," Michelle H. is incorrect that that statement was "the only item drawn from the entirety of the medical record to support a finding that the plaintiff's symptoms are not as severe as she claims them to be." Doc. No. 15-1 at 19. The ALJ also relied on medical opinions that documented Michelle H.'s ability to engage in sedentary physical activity. Tr. 761-62. Moreover, in her own testimony, Michelle H. alluded to receiving instructions from her doctor to exercise. Tr. 787 (stating that she was "trying to do what the doctor asked, . . . exercise[e]"). Courts do sometimes draw inferences about a claimant's limitations based on whether the claimant's doctor prescribed exercise. A physician's recommendation to increase physical exercise can be a fact that weighs against a finding of physical limitations. *See Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (citation omitted). Indeed, in the same letter in which he discussed her walking around "big-box stores," Dr. Blitzer stated that Michelle H. could "do more in terms of reconditioning with a more formalized exercise plan." Tr. 649.

Accordingly, the ALJ did not err in relying in part on Dr. Blitzer's statement about Michelle H. walking in "big-box stores" because that statement was not an aberration in the medical record. Other record evidence relied on by the ALJ, including Michelle H.'s own testimony, support the ALJ's conclusion that Michelle H. could engage in sedentary physical activity. *See* Tr. 760.

5. *ALJ's Reliance on Plaintiff's Statements to Her Doctors that She Felt "Fine"*

Michelle H. further contends that the ALJ erred by relying on her reports to her physicians that she was "fine," given how "well-documented" her health condition was. Doc. No. 15-1 at 20. Michelle H. essentially argues that ALJ improperly weighed the evidence in Michelle H.'s treatment notes.

As previously mentioned, the ALJ is permitted to rely on a plaintiff's treatment notes. *See Corbiere v. Berryhill*, 760 F. App'x 54, 56-57 (2d Cir. Jan 23, 2019) (affirming ALJ's RFC determination, which relied on treatment notes); *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 9 (2d Cir. 2017) (holding ALJ did not err by relying on treatment notes to determine RFC). Furthermore, the ALJ is required to consider Michelle H.'s statements about her symptoms and evaluate whether there are any conflicts between those statements and other evidence in the record. *See* 20 C.F.R. § 404.1529(c). When it comes to the ALJ's weighing of the evidence, including both evidence of Michelle H.'s underlying heart condition and evidence regarding the symptoms she reported to her physicians, "it is impermissible for a reviewing court to . . . 'reweigh evidence, or substitute its judgment for that of the Commissioner.'" *Glenn G. v. Kijakazi*, 2023 WL 2477501, at *8 (D. Conn. Mar. 13, 2023) (quoting *Kyle Paul S. v. Kijakazi*, 2021 WL 6805715, at *6 n.12 (D. Conn. Nov. 16, 2021).

The ALJ therefore did not err by considering the symptoms that Michelle H. reported to her treating physicians, which were included in her treatment notes. How to weigh that evidence, to the extent it contradicts with other evidence in the record, is a matter within the ALJ's purview.

I cannot conclude therefore that the ALJ erred in formulating Michelle H.'s RFC.

B.  The ALJ's Analysis at Step Five

Finally, Michelle H. claims because the ALJ erred in determining the RFC, the ALJ's findings at step five were unsupported by substantial evidence. Doc. No. 15-1 at 21. Specifically, Michelle H. argues that "the second hypothetical posed by the ALJ to the VE [(vocational expert)] . . . is not an accurate portrayal of the plaintiff's impairments and, therefore, the ALJ committed error in both posing the hypothetical and in relying on the VE testimony in response to the hypothetical." *Id*. at 22. The Commissioner counters by arguing that the ALJ is permitted to rely on the opinion of the VE when "the hypothetical posed is supported by substantial evidence." Doc. No. 19-1 at 20.

As I determined above, the ALJ's RFC, including the ALJ's finding that Michelle H. did not have an off task limitation, was supported by substantial evidence. Thus, at step five, the ALJ was not required to consider a hypothetical that incorporated an off task limitation, let alone specifically a 15% off task limitation. Michelle H.'s challenge to the ALJ's analysis at step five is therefore unavailing. *See Wavercak v. Astrue*, 420 F. App'x 91, 95 (2d Cir. 2011) ("Because we have already concluded that substantial record evidence supports the RFC finding, we necessarily reject Wavercak's vocational expert challenge.").

Accordingly, I conclude that remand on the bases presented by the plaintiff is not warranted.

**IV.**     **Conclusion**

For the foregoing reasons, I **deny** Michelle H.'s motion to reverse the decision of the

Commissioner. Doc. No. 15. The Commissioner's motion to affirm is **granted**. Doc. No. 19.

The decision of the Commissioner is **affirmed**, and the Clerk is directed to close this file.

So ordered.

Dated at Bridgeport, Connecticut, this 26th day of September 2024.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
